John F. Mohn, Executor, Appellant, v. Lottie J. Mohn et al., Appellees.

FRAUD: Fraudulent Representations—Education, Experience, Etc.,
1    as Bearing Thereon. Evidence reviewed, on the issue whether
defendant's education, experience, mental strength and busi-
ness capacity were such as to render her easily susceptible to
fraudulent imposition, and held to 'present a jury question.

FRAUD: Fraudulent Representations—Jury Question. Evidence re-
2    viewed, on the issue whether certain false representations were
made, and held to present a jury question.

EVIDENCE: Presumptions—Conflicting Presumptions—Jury Ques-
3    tions. A war of conflicting presumptions of equal force neces-
sarily presents a jury question.

PRINCIPLE APPLIED: Defendant gave her note for $1,050
in payment of three $350 installments of indebtedness owing
by her deceased husband on January 1, 1905-6-7. In defense to
an action on the note, defendant pleaded that the representa-
tions which were made to her, to the effect that her deceased
husband owed said installments on said date, were false. *To
prove such falsity*, defendant relied on the claim that, when a
person executes a note, or files or makes a claim against an
estate, a presumption arises that the note, in one case, and the
claim in the other case, represented *all* that was owing at that
time. Defendant showed that, after she gave the note in suit,
the payee thereof filed against the estate of her husband a
claim solely for $100, as balance due on the 1905 installment.
Held that, if a presumption did prevail as contended for by
defendant, it was at war with the following legal presump-
tions, to wit: (a) That every negotiable instrument is pre-
sumed to be upon a valuable consideration; (b) that a promis-
sory note in the possession of the payee is presumed to be un-
paid; and that at best the evidence on the matter in issue was
in equipoise.

FRAUD: Acts Constituting Fraud—Knowledge of Falsity—Con-
4    structive Knowledge. Actual knowledge that a representation
was false is not deducible, as a matter of law, from the fact
that the maker of the representation had *constructive* knowl-
edge only that it was false.

BILLS AND NOTES: Consideration—Surrender of Old Notes—Re-
5    duction in Interest—Extensions. Surrender of old notes, reduc-

tion of interest, an extension of time of payment, howsoever short, and even forbearance to make a claim, furnish adequate consideration for a new note by a wife for notes owed by her deceased husband.

*Appeal from Linn District Court.*—MILO P. SMITH, Judge.

SATURDAY,. SEPTEMBER 29, 1917.

SUIT on promissory note executed by the defendant, Lottie J. Mohn; defense that plaintiff obtained same by fraud, and that there is no consideration for it. Both plaintiff and defendants moved for a directed verdict. The motion of defendants was sustained, and plaintiff appeals.—*Reversed.*

*Randall, Courtney & Harding* and *Jamison, Smyth & Hann,* for appellant.

*Remley & Remley* and *E. A. Johnson,* for appellees.

1. FRAUD: fraudulent representations: education, experience, etc., as bearing thereon.

SALINGER, J.—I.  In his lifetime, Philip G. Mohn, the son of Conrad and Elizabeth Mohn, was the husband of the defendant, Lottie J. Mohn. After the death of Conrad, some conflict arose between Philip and his mother as to the construction of the last will of the father. The dispute was adjusted in such way as that Philip became obligated to pay the mother annually the sum of $350. Both mother and son are now dead. After the death of the son, but in the lifetime of the mother, plaintiff, another son, obtained from defendant a promissory note for $1,050, payable to the mother. This son is now the administrator of the mother's estate, and brings this suit to collect said note.

It is defended that, in taking the note, plaintiff was the agent of the payee, and that it should not be paid, because: (1)  The husband of defendant died suddenly on October 19, 1906, and left her with three small children, and another was born in June, 1907;  (2)   that, on the day of her

husband's burial, his brother took advantage of defendant's sorrowful and stricken condition, and caused her to agree to have him appointed administrator of her husband's estate, and thereupon immediately took possession of all the real estate, falsely alleging that he had a right to do this as administrator; (3) that as administrator he took possession of all exempt property; (4) that he assumed control of all her property and business transactions, and on all occasions told her what to do; (5) that he falsely alleged that the relatives of defendant would get her property from her unless he protected her from them; (6) that, at the time she signed the note in suit, plaintiff took advantage of his influence over her and directed her to sign, assuring her falsely that her distributive share of the land would be liable, otherwise; (7) that, for the purpose of deceiving and defrauding her, he represented to her, falsely, that the annual payments of $350, due January 1, 1905, 1906 and 1907, respectively, were wholly unpaid, and that her distributive share of the real estate was liable for same, and such estate would have to be sold to pay such annual payments unless she signed said note; (8) that in truth her deceased husband had fully paid all annual payments due up to the time of his death, including said three annual payments, and in truth her distributive share and the land of her deceased husband were in no way liable for the payment of said annuity; (9) that all this was well known to Elizabeth, for whom plaintiff was acting, and so known to her when plaintiff made said representations; (10) that all said representations made by plaintiff at and before the time when said note was signed were false, and so known to be at the time when he made them, acting in behalf of Elizabeth; (11) that defendant never transacted any business, was inexperienced, and relied on plaintiff to advise her what to do; that she trusted him and relied upon his advice

in all things pertaining to the estate of her late husband and her property; that she relied on said representations, and, because she believed them to be true, signed the note; and (12) that her distributive share was not liable for the debts of her husband,—she was in no manner liable therefor, —and that, because of the premises, she received no consideration or benefit whatever for executing said note.

The motion for a directed verdict made by defendant, which the trial court sustained, asserted that it was shown by the uncontradicted evidence that said note was procured by false and fraudulent representations, and by fraud; that there is no evidence that any consideration was given therefor; that the uncontradicted evidence shows that the greater part of the alleged indebtedness for which the note was given had been fully paid before same was given, and before the making of the false and fraudulent representations which procured the note; that the fact that there had been such payment was, at the time the note was obtained, well known to the agent of the payee; that, the action being bottomed on a promissory note procured by fraud, such fraud vitiates the entire contract, and, as plaintiff is not entitled to recover the whole amount of the note, he is entitled to recover no part thereof; and that, on the whole record, if a verdict should be returned for plaintiff, it would not be sustained by sufficient evidence, and it would be the duty of the court to set it aside. The appellant says it was error to sustain this motion. It is self-evident that the trial judge held that the material allegations of the answer in the essential points urged in the motion to direct were so conclusively proven as that there was no question for the jury on whether what the defendant charged was sustained by the evidence. We then have for review whether what defendant claims is established as matter of law.

II. One vital defense is, in effect, that the plaintiff induced defendant Lottie to sign the note in suit by falsely

representing to her: (1) That plaintiff's mother held two notes against the late husband of defendant, and that the husband owed the mother $350 additional for the use of the mother's land; (2) that these three items remained unpaid; (3) that the plaintiff took advantage of the defendant's sorrow over the sudden demise of her husband, of her impaired physical condition, and of her lack of business experience and capacity and of her isolation, to induce her to sign the note in suit. The claim is one of deliberate fraud or nothing, and we are told by the brief of appellee that the evidence shows that the plaintiff practiced fraud under such circumstances as that he could not help but know that the statements he made were untrue, and that "there is no question of honest mistake or innocence in the case."

As to isolation and lack of business advisors, while defendant testifies that she was in such situation, she greatly modifies this, and the weight of all the evidence on this head was fairly for a jury. As to her physical condition, one significant fact is that, though then in a very advanced state of pregnancy, she was engaged in dropping potatoes in the field almost up to the very moment at which she signed the note in suit.

This is not an attempt to avoid a note upon the ground that it was obtained from an incompetent. The only claim for the condition defendant was in is that it made the representations charged, or helped to make them, effective. We are fully persuaded that a jury would be sustained in finding that defendant had at least the average education, experience, mental strength and business capacity. The jury could find that defendant stated that, in a talk she had with payee, it was said that a renewal note could be made at five per cent., and that defendant did the figuring, which consisted of figuring out the aggregate principal of the items that made up the new note and the accrued interest upon these items. She has clear, concise and accurate com-

prehension of what property her husband left, and just what items of it were sold, and she knows that the personal property left is insufficient to pay the note she signed. She says she sold most of her own personal property after the death of her husband, but, at the time she signed the note in suit, she still had an 80, and still has it. She says they had hired help during the last five years of her husband's life; that he always left it to her to keep their time as he paid them off; that she kept the time and the payments, and looked after that, and had practically all the handling of that feature of "our" business; and that they took a paper giving the market reports, and she generally looked at that paper. She handled the poultry and knew how much she got for it, and the amount that it was sold for was always reported to her. She knew at the time how much the eggs amounted to, but she didn't keep track of it because they were mostly traded for groceries, etc., at the stores. For a year she kept books for her husband, setting down the amount of things that she had bought and that he had bought and the things sold, including the amount of produce sold, and the wages of the hired people. During that year she knew just what her husband was doing; he told her all of his affairs so that she could set them down. It was the year after they were married during which she "kept a regular bookkeeping system," but after that first year, she simply kept a daybook, a journal account. She was interested to some extent in her husband's speculations in cattle, and in his farm operations. She says she knows when an 80 she still owns was bought; that, while she hadn't been over the land, she had been along the road, knew what the price was, though she didn't know how much cash was paid; that she probably signed a mortgage to William Peffer for the balance, and she doesn't know whether or not he later transferred it; that the piece of ground her questioner calls the 80 acres was rented by Garrett, who generally

paid by check; that, whenever these checks were due, he
generally brought them to their house, and the adminis-
trator required that she sign her name on the back and turn
the checks over to him, claiming that she had no right to
the checks, and that they belonged to him; and she did it.
She has deductive power enough to say she knows that
plaintiff had no note for 1906, because her husband didn't
usually settle until after January 1st.

She seems to appreciate the exact value of words in
testifying. Being asked whether or not she had knowledge
of the business transactions of her husband specifically, as,
for instance, how much he gave for this or that property,
or whether she was consulted about that or he attended to
that all himself, she answered: "I was not consulted, but
some things I knew of, heard about.". In another place
she says that sometimes, but not always, she knew what her
husband paid for the stock he bought; that he sometimes
talked it over with her when he came home in the evening.
Again, she says the husband sometimes consulted her when
he sold the stock. Once more, she does not know "exactly"
how many cattle her husband fed from year to year, and she
only knew "by reading the sale bill" how many head of
cattle her husband had when he died. She does not know
the "exact" number of horses, but it is probably about 20.
She was able to correct her testimony by saying that, where
she had stated that her husband told her he owed nothing
unless it was for the year 1906, she meant 1905.

An attempt was made to bring out that the relations
between her father and her husband were such as to have
made it natural to suggest to her that her father should
not act as administrator of her husband's estate. In that
connection, and for that purpose, she was asked how long
it had been since her father and her husband and she had
spoken when they met on the road. She answered, "I don't
remember of ever meeting my father on the road." Being

then asked, "You were on speaking terms with your father at this time, and your husband hadn't been for a considerable time," she answered, "We always spoke when we met." It being then suggested by counsel that she had said she didn't remember that they met, she answered, "There are places to meet besides on the road." She said that her husband, her brothers and her father had had no quarrels in her presence. She was then asked: "You knew they had had such quarrels, though?" She answered, "They may have." Being then asked, "You knew they had had, didn't you?" she answered that she never heard any of it, and, this being followed up by the question, "But you had heard of it?" she answered, "A little."

It seems that defendant's father sued the estate of her husband; filed a claim against it. She was asked whether she recalled that her father presented a claim against the estate of her husband on note, and she answered, "Through the administrator I knew it." She apprehended and was able to state that her father dismissed that claim, and that he said to her that she might have the note upon which the claim was based, as a share of his own (the father's) estate.

When she went to the office of an attorney with the plaintiff, the plaintiff said they had come to have an administrator appointed, and when the lawyer produced blanks, plaintiff said, "You will have me put in as administrator, won't you—have me appointed, will you not?" She answered, "No;" whereupon plaintiff said, "Whom will you have,—your father?" She testifies that she didn't say whether she would have her father or whom; that thereupon the lawyer said he thought it would be better,—that she would better have plaintiff appointed, and the lawyer thought plaintiff would do the right thing by her. According to her own testimony, she still hesitated, because she didn't know what they wanted of her up there, and hadn't

known they were taking her there for that purpose.

We repeat that the weight to be given to her situation, physical condition, experience, business capacity and her ability to resist pressure, were fairly for the jury.

III. On the circumstances attendant upon signing the note, and on whether any and what representations charged were made, both sides say much that is not very reasonable or probable. But dealing with that was for the jury. On the substantive question, believe one, and some of the material representations alleged were made: believe the other, plaintiff never said a word to induce the writing of the note; all that was done was volunteer action on part of defendant; she did the making of the note and the signing because of a prearrangement with Elizabeth, and as a means of reducing the interest; she read the old notes as well as the new; herself made the adjustment effectuated by giving the new note. Assuming, for the sake of argument, that the representations testified to by defendant would avoid the note, it certainly was open to the jury to find that no such representations were made, and it was not for the court to decide that such representations were made.

*2. FRAUD: fraudulent representations: jury question.*

### 3-a.

Another reason why this is so is that there was sufficient question of credibility so that, for that reason, the question of whether representations charged were made should have been submitted to the jury. On examination as to whether defendant had made certain statements to the attorneys of the estate, she proved very evasive, but under pressure, said finally what a jury could well find amounted to admitting she had made false statements, and when asked if she had not elsewhere testified to the effect that no representations were remembered by her, and that she

signed simply because she was told to, which was according to her habit, she answered, "I don't know." She began with saying that she did not remember writing the note in suit; that it looks like an imitation of her writing, and if she did write it, she wrote merely because what she wrote was dictated to her. On cross-examination, she said that she not only signed the note, but wrote the note entirely herself. She discloses fairly close general knowledge of and participation in the business affairs of her late husband, and also says that after marriage she took no part in business matters.

3-b

We think it a close question whether there is any evidence of reliance, but in view of a retrial, prefer not to pass upon that point.

IV. There is no direct testimony worthy of the name for the claim that representations made, if any, were false and known to be false. As to this, defendant testifies first what is quite without evidentiary value, namely, that, in her opinion, there was no note of her husband outstanding for the rent of 1906, because the husband didn't usually settle until after January 1st; second, that she does not know whether or not there were notes for 1904, 1905 and 1906; that, while plaintiff said there were, she made no search among her husband's papers for notes or receipts; third, that she knew nothing of the affairs of the estate, including paid claims, never figured how much was due for rent at any time, and never talked about it until the day she made the note. She remembers that she and her husband talked one evening, and she told the husband he owed a little on the year 1906, but not very much.

3. EVIDENCE: presumptions: conflicting presumptions: jury questions.

The theory of the appellee is that this proof is supplied by a so-called presumption that the execution of a promissory note or a mortgage to secure indebtedness, or the like, is evidence "that all matters between the par-

ties up to that date had been settled." See *Eaves v. Henderson,* 17 Wend. (N. Y.) 190; *Gould v. Chase,* 16 Johns. (N. Y.) 226; *Smith v. Bissell,* 2 G. Greene 379; *Grimmell v. Warner,* 21 Iowa 11; at 13; *Allen v. Bryson,* 67 Iowa 591, at 597; *Hopley v. Wakefield,* 54 Iowa 711, at 713. This claim is based upon the fact that, on the 29th of April, 1909, the payee of the note in suit filed a claim in the estate of defendant's husband for rent for the season of 1905; made affidavit that the claim was genuine, just, correct and wholly unpaid; that the sum of $100.68 is justly due; that the court approved the claim; and that, on the 24th of November, 1909, the plaintiff, as administrator, paid said payee said sum, for which she receipted as being payment for the balance due for rent for 1905.

The first position of appellee upon this is that the law presumes that the payee filed all claims she then had against the estate; that, therefore, all such claims were paid and satisfied, and any representation that there were unpaid debts due from the late husband to the payee of the note were, therefore, false. Assuming this to be so, it still does not follow that the court was warranted in directing the jury to find for the defendant on that issue, because there was a conflict of presumptions. There is also a presumption that has at least as much force as the one commented upon, and which is created by our statute,—that every negotiable instrument is deemed *prima facie* to be upon valuable consideration, and that everyone whose signature appears thereto is a party thereto for value. So, there is a presumption that, if the payee has a promissory note in his possession, same remains unpaid. Of course, an existing antecedent indebtedness may be sufficient consideration for a new note. Now, we have held in *Schaefer v. Anchor M. F. Ins. Co.,* 133 Iowa 205, at 209, that presumptions of this class may be so conclusively negatived as that the court may hold, as matter of law, that such presump-

tion has been met. But that is not this case. The most that can be said is that the presumption arising from the fact that the note is in writing and signed, and from the fact that the payee retained the possession of the old notes, and that, therefore, they were unpaid when the new note was given, is met by another presumption that, where a claim is filed, all matters antedating its filing have been satisfied between the parties. Put it at its best for the appellee, and the testimony on whether there was a living indebtedness to go into the new note is in equipoise, and, as the defendant had the burden of proving that the things put into the note had been paid off, the court was not warranted in directing the jury that, as matter of law, these had been paid off.

### 4-a.

But grant, for the sake of argument,

4. FRAUD: acts constituting fraud: knowledge of falsity: constructive knowledge.

that the filing of this claim would establish, unless met, that the estate of Philip was not indebted for rent for the year 1906. Can we go beyond that, and hold that, because there is such presumption, and because all men are presumed to know the law, plaintiff was guilty of actual fraud, in that he knew there was being included in the note taken by him an item which had been paid? We think it may fairly be held, both on reason and what we decided in *Markey v. Chicago, Milwaukee & St. P. R. Co.,* 171 Iowa 255, at 262–4, that this is not so. That case concedes that, in the sense of fixing rights or imposing obligations, constructive notice and the rule which charges all men with having knowledge of the law are equal to actual knowledge; but it is fairly to be deduced from the case that neither constructive notice nor said presumption will supply *scienter;* that there cannot be guilt by construction, it being held, for instance, that one may not be guilty of negligence for failing to move with diligence on what he might learn on search of records,

and that to establish *scienter,* which means proof of a mental condition, requires affirmative proof that such mental condition existed. It follows that *scienter* was not established, as matter of law, even if the jury might have found it.

V. Only part of the remaining question has been disposed of, and that is the effect of fraud upon the claim of want of consideration. As we hold that the question of fraud was at least one for a jury, the doctrine that, where fraud taints part of the consideration, the valid consideration will not save the enforcibility, has no application. We now reach whether want of consideration was so conclusively established as that the direction for defendant was justified on that ground. As has been seen, if there be a presumption that the husband owed nothing, and, therefore, the note given in consideration of his claimed indebtedness was without consideration, there are other presumptions that negative the first presumption, which made whether he owed a jury question.

5. BILLS AND NOTES: consideration: surrender of old notes: reduction in interest: extensions.

If the husband was indebted to the payee, a consideration for the new note is made out if the jury could find that the two old notes executed by the husband were surrendered to the defendant in consideration of her making the new note, and that she retains them. It is true there is a conflict on whether they were ever surrendered to her, but it is a conflict, and it was for the jury and not for the court to resolve it. If the jury found that the husband was indebted, a sufficient consideration, at least as to those who represented the husband, is furnished by the fact that there was a reduction of interest, the old indebtedness drawing six while the renewal note drew five per cent. Upon this, too, there is conflict. At least one witness, Oscar Mohn, testifies positively that such change

in interest was discussed and agreed upon. This question, too, was for the jury.

There is a contention that there is no evidence that there was any extension of time, because the date at which the note sued on became due is left blank. We think it appears fairly, from the record as a whole, or at least sufficiently so to make that a jury question, that taking a new note at the time it was taken, in view of what the old notes are said to have been given for, worked an extension; that, if the note had been paid on the very day it was given, it would still have been paid at a time later than the old notes required. This furnished a consideration.

The last contention for the appellee is that, as the personal property of Philip was insufficient to pay the claims against his estate, and as the distributive share of the defendant was not liable for debts, and as, therefore, no property belonging to her could be taken for payment of debts against the estate of her husband, therefore the note she signed was, as to her, without consideration. She and her child were beneficially interested in the estate of Philip. The mere forbearance to make a claim against that estate, or surrendering the notes against her dead husband for her own note, seems to us to be sufficient to support the new note. Moreover, it appears nowhere that, whatever was the relation of the personal property to the debts, there was not land left which, if sold to pay the notes of Elizabeth and her claim for the rent of 1906, would not have diminished, or have led to the selling of, lands left by the husband. We think *Cole v. Charles City Nat. Bank,* 114 Iowa 632, at 634, and *Hartman v. Chicago G. W. R. Co.,* 132 Iowa 582, at 584, fairly support the claim that the case of the defendant, as a whole, was one for a jury; and that *Thompson v. Maugh,* 3 G. Greene 342, *Atherton & Ricker v. Marcy,* 59 Iowa 650, at 653, *Young v. Shepard,*

(Mich.) 83 N. W. 403, and *Union and Planters' Bank v. Jefferson*, (Wis.) 77 N. W. 889, give very considerable support to the claim of the appellant that the note in suit was sufficiently supported by a consideration. It follows that there must be a reversal because a verdict was directed for the defendant.

VI. The appellant presents that a verdict should have been directed in his favor, and it is responded that, while such motion was made at the close of the testimony for the defendant, the plaintiff thereafter put in testimony, did not renew his motion, and, therefore, according to our oft repeated decisions has waived any error in overruling the motion to direct for plaintiff. Some of the cases which make this rule of practice also hold that it does not preclude from raising the sufficiency of evidence to sustain the verdict. But the effect of that holding needs no consideration. For it appears that while, at the close of all the testimony, there was not a formal motion to direct verdict, the plaintiff did move the court to withdraw the defense of fraud, misrepresentation and undue influence. This was overruled, and that ruling is properly presented on this appeal. We have pointed out that there is a conflict on whether the representations alleged were made; have left the question of whether there was reliance open. As we hold that it is a jury question whether the husband of defendant owed anything, we have thus left open whether, if representations are found to have been made, they were falsely made. While we hold that there is no direct testimony of falsity, and that neither falsity nor *scienter* are made out as matter of law, we are not prepared to say, in view of a retrial, that, as matter of law, the proof of falsity and *scienter* has failed. It follows that plaintiff is not entitled to a directed verdict upon the record now presented to us,

or, at any rate, may not be entitled thereto upon the record that may be made on retrial.

For the reasons pointed out, the judgment of the district court must be and is—*Reversed.*

GAYNOR, C. J., LADD and EVANS, JJ., concur.